Brad S. Daniels, OSB No. 025178
brad.daniels@stoel.com
Jacob Goldberg, OSB No. 162565
jacob.goldberg@stoel.com
STOEL RIVES LLP
760 SW Ninth Avenue, Suite 3000
Portland, OR  97205
Telephone:  503.224.3380
Facsimile:  503.220.2480

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| NW NATURAL GAS STORAGE, LLC, an Oregon limited liability company,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>SENSA HOLDINGS LLC, a Delaware limited liability company; and SCIENS ECORP NATURAL GAS STORAGE HOLDINGS LLC, a Delaware limited liability company,<br><br>　　　　Defendants. | Case No.: 3:22-cv-00954<br><br>COMPLAINT |

NW Natural Gas Storage, LLC ("Plaintiff" or "NWNGS") hereby brings this Complaint against SENSA Holdings LLC ("SENSA") and Sciens eCorp Natural Gas Storage Holdings LLC ("SCIENS" and together with SENSA "Defendants") and alleges as follows:

Page 1   -   COMPLAINT

## I. INTRODUCTION

1.  In June 2018, NWNGS and SENSA entered into a Purchase and Sale Agreement (as amended, the "PSA") for NWNGS to sell to SENSA its interest in an underground natural gas storage facility in Central California. *See* **Exhibit A**. The PSA provided that, after making a payment at closing, SENSA would pay NWNGS additional earnout payments based on earnings from the gas storage facility after the closing of the transaction. In a separate guaranty agreement ("Guaranty"), SCIENS guaranteed to NWNGS the punctual payment in full of any earnout payments due under the PSA and agreed to pay to NWNGS any earnout payments that SENSA had failed to make. *See* **Exhibit D**.

2.  For nearly a year following the satisfaction of all closing conditions in the PSA, and notwithstanding SENSA's obligation under the PSA to close on the business day following satisfaction of those closing conditions, SENSA needlessly and repeatedly delayed closing, resulting in multiple amendments to the PSA. When the deal finally closed, SENSA impermissibly granted a lien or security interest to a third party on the collateral securing NWNGS's right to earnout payments, failed to timely provide financial information to NWNGS as it is obligated to do under the PSA, miscalculated the first earnout payment, and refused to make that payment. Although the Guaranty at that point required SCIENS to make the earnout payment, SCIENS has not made this payment to date.

3.  After months of delay caused by SENSA's repeated failure to engage in good faith with NWNGS to resolve those matters, NWNGS now simply requires that SENSA and SCIENS abide by their clear contractual obligations. NWNGS seeks to recover the first earnout payment, to ensure that SENSA timely provides required documents, and to protect its right, and the collateral securing this right, to receive future earnout payments.

Page 2  -  COMPLAINT

## II.  PARTIES

4. NWNGS is an Oregon limited liability company, organized and existing under the laws of Oregon, with its principal place of business located at Portland, Oregon.

5. SENSA is a Delaware limited liability company, organized and existing under the laws of Delaware, with its principal place of business at Houston, Texas.

6. SCIENS is a Delaware limited liability company, organized and existing under the laws of Delaware, with its principal place of business at Houston, Texas.

## III.  JURISDICTION

7. The Court has jurisdiction over this dispute pursuant to 28 U.S.C. § 1332(a). NWNGS is a citizen of Oregon, because NWNGS's sole member is a citizen of Oregon. SENSA and SCIENS are citizens of Delaware, because each of the members of SENSA and SCIENS are citizens of Delaware. Further, as alleged herein, the amount in controversy exceeds $75,000.

8. Venue is proper in this judicial district because a substantial part of the events and omissions giving rise to the claims herein occurred in the District of Oregon. 28 U.S.C. § 1391(b)(2). Moreover, the Tenth Amendment to the Purchase and Sale Agreement dated December 4, 2020 ("Tenth Amendment") provides that any suit, action, or other proceeding arising out of or related to any earnout payment shall be brought in "the United States District Court for the District of Oregon of the courts of the State of Oregon sitting in Multnomah County, Oregon." *See* **Exhibit B**. The LLC Interest Pledge Agreement ("Pledge Agreement"), which concerns the collateral securing NWNGS's right to earnout payments, provides that any action or proceeding relating to the Pledge Agreement shall be brought in state or federal court sitting in the state of Oregon. *See* **Exhibit C**. The Guaranty provides that SCIENS has consented to the jurisdiction of any state or federal court in Oregon for any suits relating to the

Page 3   -   COMPLAINT

Guaranty. *See* **Exhibit D**. As alleged herein, this dispute relates to SENSA's obligation to make earnout payments to NWNGS and its compliance with the Pledge Agreement and to SCIENS's obligations under the Guaranty.

### IV.  GENERAL ALLEGATIONS

**A.  The PSA.**

9.  On June 20, 2018, NWNGS and SENSA entered into the PSA pursuant to which NWNGS agreed to sell to SENSA all the membership interests in Gill Ranch Storage, LLC ("GRS"), the operator and majority owner of an underground natural gas storage facility located off California Highway 180 between Fresno, California and Mendota, California.

10.  As originally agreed, Section 2.1(a) of the PSA provided for SENSA to make an initial purchase price payment to NWNGS of $25,000,000 at closing, and Section 2.1(c) of the PSA provided for SENSA to make subsequent earnout payments to NWNGS based on GRS's financial performance.

11.  After the closing conditions were satisfied in January 2020, closing of the transaction stalled. For months, SENSA repeatedly delayed closing and indicated that it lacked sufficient funds to pay the initial purchase price of $25,000,000.

12.  For instance, on January 24, 2020, SENSA sent NWNGS a "timeline document" that purported to include "work-streams we [SENSA] are working on to bring us to a position to close." SENSA's timeline inexplicably included a four-week period for "Lender selection" and a subsequent four-week period to "Finalize financing agreements," even though SENSA had represented and warranted to NWNGS that it had funding sufficient to close that transaction and that "its obligations to effect the transactions contemplated hereby are not subject to the

availability to Buyer or any other Person of financing." *See* PSA Section 5.8. According to SENSA's timeline, closing would not occur until late March 2020.

13. On January 28, 2020, NWNGS confirmed to SENSA that it was ready, willing, and able to consummate the closing on January 31, 2020, in accordance with the terms of the PSA. Rather than close as required, on February 6, 2020, SENSA proposed that NWNGS provide SENSA with a $3.8 million indemnity associated with SENSA's perception of risk associated with the third-party minority owner of the storage facility. The transaction did not close in late March 2020. On May 7, 2020, SENSA informed NWNGS that it would likely be "in a position to close during the fourth week of June, so outside date of Friday June 26th." The transaction did not close on June 26, 2020.

14. As an accommodation to SENSA, between January 31, 2020 and September 28, 2020, NWNGS repeatedly agreed to extend the automatic termination of the PSA through multiple amendments to the PSA. In one such amendment, dated June 26, 2020, NWNGS and SENSA agreed that GRS's subsequent capital expenditures would not adversely affect NWNGS in the customary adjustments for GRS's net working capital at closing.

15. The transaction did not close for nearly eleven months after NWNGS told SENSA that all closing conditions had been satisfied and it was fully prepared to close the transaction.

**B.    Earnout Provision**

16. On December 4, 2020, in order to finally and concurrently close the transaction, NWNGS and SENSA entered into the Tenth Amendment, which remains the operative amendment to the PSA. Under the terms of the Tenth Amendment, the initial purchase price was reduced to $13,500,000, and the earnout payment calculation was altered to compensate NWNGS for this substantially lower initial purchase price.

Page 5   -   COMPLAINT

17. Specifically, as amended, the earnout payment ("Earnout Payment") provision, Section 2.1(c)(i) of the PSA, provides:

> "Buyer (or, at the direction of Buyer, the Company) shall pay to Seller, with respect to each Calculation Period, an amount (each, an "Earnout Payment"), if any, equal to the product of (1) an amount equal to (A) EBITDA for such Calculation Period, minus (B) the CapEx Allowance for such Calculation Period; multiplied by (2) eighty percent (80%); *provided, however*, that in no event shall Buyer be obligated to pay Earnout Payments to Seller in excess of the Maximum Earnout Amount (either through actual payment thereof or as a set-off against Damages or other amounts indemnifiable by Seller pursuant to this Agreement)."

18. The Tenth Amendment defines "CapEx Allowance," "with respect to any Calculation Period," as "100% of the actual capital costs [GRS] incurs in maintaining the Facility during such Calculation Period." "Calculation Period" is defined as "(a) *that portion* of the Initial Gas Storage Year commencing on the Closing Date, and (b) each of the following Gas Storage Years, respectively, thereafter." (Emphasis added.) "Gas Storage Year" is defined as each year starting on April 1 and ending on March 31. And, the Maximum Earnout Amount is defined as "$15,000,000" subject to a net working capital adjustment.

19. Therefore, under the Tenth Amendment, SENSA is required to pay to NWNGS 80% of an amount based on GRS's earnings for the applicable Calculation Period minus capital costs GRS incurs in maintaining the gas storage facility during that Calculation Period, with the initial Calculation Period commencing on the closing date—until SENSA has cumulatively paid the Maximum Earnout Amount (as adjusted for Final Net Working Capital) to NWNGS. Any Earnout Payment is also reduced by certain income tax liability that is directly attributable to SENSA's ownership of GRS.

20. In order to ensure that such payments are accurately calculated, Section 2.1(c)(ii) of the PSA requires SENSA provide to NWNGS certain documents, including unaudited

Page 6   -   COMPLAINT

financial statements within 45 days after the end of each fiscal quarter within a Gas Storage Year Period (*i.e.*, by February 14, May 15, August 14, and November 14), audited financial statements within 90 days after the end of each Gas Storage Year (*i.e.*, by June 29 each year), and an annual budget for each Gas Storage Year no later than 30 days prior to the start of such Gas Storage Year (*i.e.*, by March 2 each year).

21. Section 2.1(c)(iii), similarly, requires SENSA to prepare and deliver a written statement setting forth SENSA's determination of EBITDA, CapEx Allowance, and the resulting Earnout Payment within 45 days after the end of each Calculation Period (*i.e.*, by May 15 each year).

**C.     Pledge Agreement**

22. To ensure that NWNGS could have confidence in its collection of the Earnout Payments, also on December 4, 2020, NWNGS and SENSA entered into the Pledge Agreement. In this agreement, SENSA pledged all the membership interests in GRS, and granted NWNGS a security interest in these membership interests, as collateral for SENSA's obligations under Section 2.1(c) of the PSA, including payment of Earnout Payments to NWNGS.  *See* **Exhibit C**.

23. SENSA also committed to several covenants to protect NWNGS's interest in this collateral. Specifically, at Section 4(f), the Pledge Agreement provides that SENSA "would not permit *any* lien on or security interest [in] any of the Pledged Collateral [membership interests in GRS] except liens or security interests in favor of Seller [NWNGS]." (Emphasis added.)

24. In Section 6(a) to the Pledge Agreement, SENSA agreed that "[u]pon the occurrence and during the continuance" of a default under the Pledge Agreement, NWNGS, or its nominee, would be entitled to exercise all management, voting, consent, and other rights with respect to the membership interests in GRS.

Page 7   -   COMPLAINT

25. Moreover, in Section 1(a), the Pledge Agreement provides that the Pledged Collateral secures any and all damages, defined to include attorneys' fees, costs, and disbursements, in connection with any failure to make required earnout payments.

26. After finalizing the language in the Tenth Amendment and the Pledge Agreement, SENSA wrote to NWNGS acknowledging that the Pledge Agreement "says that there can be NO liens," and requesting that NWNGS "waive[] such provision of the Pledge Agreement" to allow SENSA to grant a secondary lien on the membership interest of GRS to SENSA's lender.

27. NWNGS did not waive this restriction as SENSA had requested.  Instead, NWNGS communicated that it would waive this restriction "to the extent necessary to allow SENSA to grant a lien to this entity which is junior to our first position lien" *if* "an acceptable inter-creditor agreement between NWNGS" and SENSA's lender was negotiated the following week.

28. At no time did SENSA's lender negotiate an inter-creditor agreement with NWNGS.

29. Accordingly, there has been no waiver of the requirement that SENSA not permit any lien on or security interest in any of its membership interests in GRS.

**D.     Guaranty**

30. Also on December 4, 2020, SCIENS, the parent company of SENSA, executed the Guaranty for the benefit of NWNGS.  *See* **Exhibit D**.

31. In Section 1(a), the Guaranty provides that SCIENS, as guarantor:

> "irrevocably and unconditionally guarantees to Seller [NWNGS] the due and punctual payment in full of (a) any and all Earnout Payments payable under the PSA from time to time . . . and any all Damages incurred by Seller from time to time in connection with or as a result of any breach by Buyer [SENSA] of Section 2.1(c) of the PSA.  The guaranty in the preceding sentence is an absolute,

Page 8   -   COMPLAINT

present and continuing guaranty of payment and not of collectability and is in no way conditional or contingent upon any attempt to collect from Buyer or any other guarantor of the Obligations or upon any other action occurrence or circumstance whatsoever.  If Buyer shall fail to pay any of the Obligations, Guarantor agrees to pay the same when due to Seller without demand, presentment, protest or notice of any kind, in lawful money of the United States of America, pursuant to the requirements for payment specified in the PSA."

32. In Section 1(b), the Guaranty further requires SCIENS to indemnify NWNGS "from and against any damage, loss, cost or expense (including without limitation attorneys' fees, costs and disbursements)" that NWNGS might incur to enforce the Guaranty or from any breach of the Guaranty.

33. Accordingly, the Guaranty requires SCIENS to make any Earnout Payment that SENSA has refused to pay and to reimburse NWNGS for all attorney's fees and other damages that NWNGS has incurred as a result of SENSA's failure to make a required Earnout Payment.

**E.     Closing and Net Working Capital Adjustment**

34. The sale closed on December 4, 2020, and SENSA made the initial $13,500,000 payment required under the Tenth Amendment.

35. Like many transactions of this sort, the PSA called for pricing adjustments to ensure that the benefits or burdens of any changes to GRS's net working capital, between the signing of the PSA and the closing of the transaction, were appropriately allocated between the seller or buyer.  Here, in light of SENSA's repeated failure to close, the PSA provided that the capital expenditures made by GRS after June 26, 2020 would not harm NWNGS in the net working capital adjustment.

36. GRS made capital expenditures totaling $3,068,000 after June 26, 2020 and before December 4, 2020, including with respect to the facility's compressor station and wells.

Page 9   -   COMPLAINT

37. Accordingly, those $3,068,000 of capital expenditures are considered an asset in the adjustment of GRS's net working capital in accordance with the PSA. Of those pre-December 4, 2020 capital expenditures, $1,912,000 was in accounts payable at closing and considered a liability in the adjustment of GRS's net working capital in accordance with the PSA. As a result, and in accordance with the PSA, these $1,912,000 of capital expenditures netted out and did not increase or decrease net working capital, such that NWNGS was not adversely affected by these $1,912,000 of pre-December 4, 2020 capital expenditures.

38. After accounting for these capital expenditures and other customary adjustments pursuant to the PSA, the Maximum Earnout Amount increased by $1,257,678 in accordance with the Tenth Amendment.

F.   **Post-Closing Conduct**

39. Following closing, SENSA repeatedly failed to perform its obligations under the earnout provisions of the PSA by failing to timely provide required documents, and then by miscalculating and refusing to pay the first Earnout Payment. SENSA also breached the Pledge Agreement by granting a security interest in the membership interests of GRS. SCIENS breached the Guaranty by failing to pay the first Earnout Payment to NWNGS.

40. First, SENSA permitted its lender, SBI II LLC, to file a UCC financing statement securing as collateral "all assets of Debtor, including without limitation all of Debtor's right, title and interest in the membership interest in Gill Ranch Storage, LLC." In other words, even though SENSA had acknowledged that the Pledge Agreement specifically provides that SENSA would not permit any lien on the membership interest of GRS, SENSA ignored its obligations under the Pledge Agreement and granted a lien or security interest in those membership interests

to SBI II LLC, which then perfected that lien or security interest by filing the UCC financing statement.

41.     Second, SENSA failed to timely provide information and documents as the earnout provisions of the PSA required.  For example, SENSA did not provide NWNGS with a Calculation Statement by May 15, 2021, as required in Section 2.1(c)(iii) of the PSA.  Instead, it provided this statement to NWNGS on June 28, 2021, more than a *month after* the deadline in the Tenth Amendment had passed.  Similarly, SENSA did not provide unaudited financial statements for the period between closing and March 31, 2021 until June 28, 2021, *more than four months* after these statements were due for the last quarter of 2020 and more one month after these statements were due for the first quarter of 2021.  In addition, SENSA did not provide unaudited financial statements for the six months ending on June 30, 2021 until October 19, 2021, more than two months after these statements were due for the second quarter of 2021, and SENSA has *never* provided NWNGS audited financial statements, as required under Section 2.1(c)(ii).

42.     Instead, without any foundation, SENSA has disputed that it has any obligation to provide financial statements to NWNGS. In May 2022, SENSA claimed that timely providing financial statements as required under the PSA were not "deliverables" it was obligated to provide to NWNGS.

43.     Third, SENSA miscalculated the Earnout Payment for the first Calculation Period (*i.e.*, for the Initial Gas Storage Year commencing December 4, 2020 and ending March 31, 2021).  In its tardy June 28, 2020 Calculation Statement, SENSA calculated a CapEx Allowance of $1,989,000, and EBITDA of $1,651,000.  As SENSA's calculation of CapEx Allowance exceeded EBITDA, SENSA calculated no Earnout Payment was due.

115828930.10 0055570-00449

44. Most of SENSA's asserted CapEx Allowance, specifically $1,912,000 of SENSA's $1,989,000 total allowance, however, was incurred *before* closing on December 4, 2020. This amount includes capital expenditures on the facility's compressor station and wells.

45. Under the terms of the Tenth Amendment, capital expenditures incurred before December 4, 2020 are not included in the CapEx Allowance.

46. Therefore, this amount should not be subtracted from the EBITDA figure of $1,651,000. Based on the unaudited financial statements SENSA provided months late, NWNGS calculates the Earnout Payment for the period of December 4, 2020 to March 4, 2021 to be no less than $944,000.

47. On August 11, 2021, NWNGS timely provided an Objection Notice to SENSA's Calculation Statement and demanded prompt payment of $944,000 as the Earnout Payment for the first Calculation Period.

48. SENSA has refused to make this payment, negotiate in good faith over this amount, or submit the matter to a Neutral Auditor, each as required by the PSA.

49. On November 2, 2021, NWNGS then provided additional notice that SENSA had failed to properly resolve the issue and further that it was in breach of Section 4(f) of the Pledge Agreement.

50. The problem could be avoided if SCIENS were to honor its obligations under the Guaranty. But SCIENS has not made any payment to NWNGS or otherwise indemnified NWNGS for its damages.

51. NWNGS has fully exhausted all required conditions under the PSA and Pledge Agreement prior to bringing this action. The Guaranty includes no conditions that NWNGS must perform before NWNGS may bring suit to enforce its terms.

## V.  CAUSES OF ACTION

## FIRST CAUSE OF ACTION

### (Breach of Contract)

### (Against All Defendants)

52.     NWNGS realleges the preceding paragraphs as set forth herein.

### Count One – Breach of Section 2.1(c) of the PSA

### (Against SENSA)

53.     The PSA, as amended through the Tenth Amendment, is an enforceable contract.

54.     Section 2.1(c) of the PSA requires, among other things, that (i) SENSA provide a Calculation Statement for Earnout Payments to NWNGS within 45 days after March 31 every year until the Maximum Earnout Amount has been paid in full; (ii) provide unaudited financial statements of GRS to NWNGS within 45 days after the end of every fiscal quarter until the Maximum Earnout Amount has been paid in full; (iii) provide audited financial statements of GRS to NWNGS within 90 days after March 31 every year until the Maximum Earnout Amount has been paid in full; and (iv) pay to NWNGS an Earnout Payment(s), which NWNGS calculates to be no less than $944,000 for the Gas Storage Year ending March 31, 2021.

55.     NWNGS has fully performed its obligations under the PSA.

56.     SENSA breached its obligations under Section 2.1(c) of the PSA by (i) failing to provide a Calculation Statement to NWNGS within 45 days after March 31, 2021 for the Calculation Period ending March 31, 2021 and failing to provide a Calculation Statement to NWNGS within 45 days after of March 31, 2022 for the Calculation Period ending March 31, 2022; (ii) failing to provide unaudited financial statements of GRS to NWNGS within 45 days after the end of each fiscal quarter since December 4, 2020; (iii) failing to provide audited

financial statements of GRS to NWNGS within 90 days after March 31, 2021 for the Gas Storage Year ending March 31, 2021 and failing to provide audited financial statements of GRS to NWNGS within 45 days after of March 31, 2022 for the Gas Storage Year ending March 31, 2022; and (iv) failing to pay to NWNGS an Earnout Payment for the Calculation Period ending March 31, 2021, which NWNGS calculates at no less than $944,000.  SENSA may have further breached its obligations under Section 2.1(c) of the PSA by failing to pay to NWNGS an Earnout Payment for the Calculation Period ending March 31, 2022.

57. As a direct and proximate result of SENSA's breaches of the PSA, NWNGS has suffered and continues to suffer damage and harm.

58. NWNGS is entitled to recover damages in an amount to be determined at trial, but, in any event, no less than $944,000 plus pre-prejudgment interest accruing at a statutory rate of 10% per annum as of August 11, 2021.

**Count Two – Breach of the Pledge Agreement**

**(Against SENSA)**

59. The Pledge Agreement is an enforceable contract.

60. The Pledge Agreement provides that SENSA will not grant any lien on or security interest in the membership interests of GRS except liens or security interests in favor of NWNGS.

61. The Pledge Agreement further provides that the membership interests in GRS secure any and all damages, defined to include attorneys' fees, costs, and disbursements, incurred by NWNGS in connection with any breach of the earnout provisions of the PSA.

62. NWNGS has fully performed its obligations under the Pledge Agreement.

Page 14 -   COMPLAINT

63. SENSA breached its obligations under the Pledge Agreement by granting SBI II LLC a lien or security interest in the membership interests of GRS.

64. As set forth above, SENSA breached the earnout provisions of the PSA.

65. As a direct and proximate cause of SENSA's breach of the Pledge Agreement, NWNGS has suffered and continues to suffer damages and harm.

66. NWNGS is entitled to recover damages in an amount to be determined at trial.

## Count Three – Breach of the Guaranty

### (Against SCIENS)

67. The Guaranty is an enforceable contract.

68. Pursuant to the Guaranty, SCIENS guarantees the due and punctual payment in full of any and all Earnout Payments payable under the PSA, agrees to pay any Earnout Payments to NWNGS when due if not paid by SENSA, and indemnifies NWNGS for all damages resulting from any breach of the Guaranty, including attorneys' fees, costs, and disbursements.

69. NWNGS has fully performed its obligations under the Guaranty.

70. SCIENS has breached its obligations under the Guaranty in failing to make punctual payment, in full, of the Earnout Payment for the Calculation Period ending March 31, 2021.

71. As a direct and proximate cause of SCIENS's breach of the Guaranty, NWNGS has suffered and continues to suffer damages and harm, including attorneys' fees, costs, and disbursements.

72. NWNGS is entitled to recover from SCIENS an amount to be determined at trial, but, in any case, no less than $944,000 plus attorney's fees, costs, and disbursements incurred to date.

## SECOND CLAIM FOR RELIEF

### (Declaratory Judgment - 28 U.S.C. § 2201)

### (Against All Defendants)

73. NWNGS realleges the preceding paragraphs as set forth herein.

### Count 1 – Section 2.1(c) of the PSA

### (Against SENSA)

74. An actual, justiciable controversy exists between NWNGS and SENSA regarding the calculation of the Earnout Payment for the Calculation Period ending March 31, 2021 and the requirement that SENSA provide audited financial statements pursuant to the PSA.

75. NWNGS is entitled to a judgment declaring that capital expenditures made by GRS before December 4, 2020 may not be included in any calculation of CapEx Allowance and that the first Earnout Payment is not less than $944,000.

76. NWNGS is entitled to a judgment declaring that it is entitled to timely audited and unaudited financial statements and all other information SENSA is required to provide pursuant to Section 2.1(c) of the PSA.

### Count 2 – Pledge Agreement

### (Against SENSA)

77. An actual, justiciable controversy exists between NWNGS and SENSA regarding the covenant in the Pledge Agreement prohibiting SENSA from allowing a lien or security interest in the membership interests of GRS in favor of anyone other than NWNGS.

78. NWNGS is entitled to a declaration that SENSA breached the Pledge Agreement by granting to SBI II LLC a lien or security interest in the membership interests of GRS.

79. Pursuant to Section 6(a) of the Pledge Agreement, NWNGS is entitled to exercise all management, voting, consent, and other rights in the membership interests of GRS unless and until SENSA cures its breach of the Pledge Agreement.

80. Pursuant to Section 1(a) of the Pledge Agreement, NWNGS's entitlement to exercise all management, voting, consent, and other rights remains in place unless and until SENSA cures its breaches of the earnout provisions of the PSA and makes payments to NWNGS for all damages, including attorneys' fees, costs, and disbursements, incurred by NWNGS in connection with SENSA's breach of the earnout provisions of the PSA.

81. NWNGS is further entitled to a declaration that it is entitled under the Pledge Agreement to exercise all management, voting, consent, and other rights in the membership interests of GRS unless and until SBI II LLC's security interest in the membership interests of GRS is removed and SENSA has paid all amounts due to NWNGS under the PSA.

## Count 3 – Guaranty

### (Against SCIENS)

82. An actual, justiciable controversy exists between SCIENS and NWNGS regarding SCIENS's obligations to guarantee and make the Earnout Payment for the Calculation Period ending on March 31, 2021 in an amount no less than $944,000.

83. An actual, justiciable controversy exists between SCIENS and NWNGS regarding SCIENS's obligations to indemnify and hold NWNGS harmless for any and all damages, including attorney's fees, costs, and disbursements, incurred as a result of breach of the Guaranty.

84. NWNGS is entitled to a declaration that SCIENS breached the Guaranty in failing to make the Earnout Payment for the Calculation Period ending on March 31, 2021, in an amount no less than $944,000.

85. NWNGS is entitled to a declaration that SCIENS must indemnify NWNGS and hold it harmless for any and all damages, including attorney's fees, costs, and disbursements, incurred as a result of breach of the Guaranty.

### THIRD CAUSE OF ACTION

### (Breach of the Implied Covenant of Good Faith and Fair Dealing)

### (Against SENSA)

86. NWNGS realleges the preceding paragraphs as set forth herein.

87. The PSA contains an implied covenant of good faith and fair dealing pursuant to which SENSA was obligated to deal in good faith and fairly with NWNGS, and to avoid any act that would deprive NWNGS of the benefits it is entitled to under the PSA.

88. SENSA breached this implied covenant by delaying the closing, failing to provide information to NWNGS, miscalculating the Earnout Payment for the Calculation Period ending March 31, 2021, so as to deprive NWNGS of its right to this earnout payment, and making vague, baseless and unfounded claims about the condition of the subject underground gas storage facility.

89. As a direct and proximate cause of SENSA's breach of the implied covenant of good faith and fair dealing, NWNGS has suffered and continues to suffer damages and harm.

90. NWNGS is entitled to recover damages in an amount to be determined at trial, but, in any event, no less than $944,000 plus pre-judgment interest accruing at a statutory rate of 10% per annum as of August 11, 2021.

## VI.  PRAYER FOR RELIEF

WHEREFORE, NWNGS prays for the following relief:

      A.      On NWNGS's first claim for relief, judgment in favor of NWNGS and against Defendants in an amount to be proven at trial, but no less than $944,000 plus prejudgment interest accruing at a statutory rate of 10% per annum as of August 11, 2021, attorney's fees, costs, and disbursements to date;

      B.      On NWNGS's second claim for relief, an order declaring that (i) SENSA has improperly calculated the Earnout Payment for the Calculation Period ending March 31, 2021; (ii) SENSA has failed to timely provide audited and unaudited financial statements and other required information to NWNGS; (iii) SENSA has breached the Pledge Agreement by granting SBI II LLC a lien or security interest in the membership interests of GRS and NWNGS is entitled under the Pledge Agreement to exercise all management, voting, consent, and other rights in the membership interests of GRS until such lien or security interest is eliminated, (iv) SENSA has breached the earnout provisions of the PSA and, as a result, NWNGS is entitled under the Pledge Agreement to exercise all management, voting, consent, and other rights in the membership interests of GRS until SENSA makes payments to NWNGS for all damages, including attorneys' fees, costs, and disbursements, incurred by NWNGS in connection with SENSA's breach of the earnout provisions of the PSA; and (v) SCIENS has breached the Guaranty in failing to make payment of the Earnout Payment not received from SENSA for the Calculation Period ending March 31, 2021 and failing to indemnify NWNGS for damages resulting from SENSA's failure to time pay such Earnout Payment;

  C. On NWNGS's third claim for relief, judgment in favor of NWNGS and against SENSA in an amount to be proven at trial, but not less than $944,000 plus pre-judgment interest accruing at a statutory rate of 10% per annum as of August 11, 2021;

  D. Award legal and equitable damages to NWNGS in an amount to be proven at trial;

  E. Award NWNGS pre- and post-judgment interest;

  F. Award NWNGS attorneys' fees, costs, and disbursements incurred to date; and

  G. Award such other and further relief as the Court deems just and equitable.

DATED:  July 1, 2022.

        STOEL RIVES LLP


        */s/ Brad S. Daniels*
        BRAD S. DANIELS, OSB No. 025178
        brad.daniels@stoel.com
        JACOB GOLDBERG, OSB No. 162565
        jacob.goldberg@stoel.com
        Telephone:  503.224.3380

        Attorneys for Plaintiff